# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH


### NO. 2-07-135-CV

IN THE INTEREST OF E.W.A., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Joshua A. and Stephanie A. appeal from the trial court's order terminating the parent-child relationship between them and their son, E.A, following a bench trial. In separate briefs, Appellants both challenge the trial court's decision to permit the Department of Family and Protective Services ("the Department") to amend its petition with regard to Joshua less than seven days before trial and the factual sufficiency of the evidence to support the trial

---

[1]  *See* TEX. R. APP. P. 47.4.

court's section 161.001(1) and best-interest findings. *See* TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007). Joshua also challenges the legal sufficiency of the evidence to support the trial court's section 161.001(1) findings. *See id.* We affirm.

**Factual Background**

E.A. was born on September 4, 2004. Stephanie has five older children of whom she has given up or lost custody, and Joshua has another child, A.A., with whom his parent-child relationship was previously terminated.

Stephanie has had an illegal drug problem since the birth of her first child in 1988. In 1999, her third child tested positive for marijuana at birth; in 2001, her fourth child tested positive for amphetamine at birth; and in 2002, her fifth child tested positive for both marijuana and methamphetamine at birth. During the pendency of this case, Stephanie submitted to six out of the twelve drug tests requested by the Department. (She denied that the Department had requested twelve tests.) One of the hair-follicle tests to which she did submit came back positive for methamphetamine five months before trial; Stephanie admitted that she had relapsed on methamphetamine. Another test, a urinalysis, was reported as "off-temp," meaning that the urine sample did not come from Stephanie's body at the time of the test. When Stephanie submitted the "off-temp" sample, the drug-testing lab asked her to drink some water and submit another urine sample, but she left the test site instead.

2

Stephanie's mother testified that Stephanie told her she had smoked marijuana as recently as February 14, 2007, six weeks before trial. A hair follicle test conducted about a week before trial was negative, which indicated that Stephanie had not used drugs for the prior ninety days.

Joshua also had a drug problem. Joshua testified that he has used marijuana off and on since high school and methamphetamine since he was fourteen years old. Of the twelve drug tests requested by the Department during the pendency of this case, Joshua submitted to seven. A hair follicle test came back positive for methamphetamine use in November 2006; Joshua said that was because he had been associating with people who smoke methamphetamine. He tested positive for marijuana in January 2007.

The Department asked both Stephanie and Joshua to attend a Department-approved drug treatment program as a part of their service plans. Neither of them attended an approved program, but both had completed an unapproved, church-sponsored drug/alcohol class called "ACTS" by the time of trial. The class's teacher, Dean Cashen, who is not a licensed chemical dependency counselor, described the class as "not a 12-step class . . . it's a 12-lesson class." Cashen said that anyone who attended twelve lessons would receive a certificate of completion. Stephanie and Joshua began attending the classes, then stopped for six or eight weeks, and then resumed attendance; Cashen was "very comfortable" that they attended at least twelve lessons,

3

including those before and after the hiatus. Stephanie and Joshua had already started taking the classes when they tested positive for methamphetamine in November 2006. Cashen testified that it was very unsafe for parents of small children to use drugs.

Stephanie changed residences frequently between E.A.'s birth and the termination trial. She and Joshua were living together in Colorado when E.A. was born. Sometime after E.A.'s birth, and while the three were still living in Colorado, Joshua was convicted of assaulting Stephanie. Joshua, Stephanie, and E.A. moved in with Stephanie's cousin in Grand Junction, Colorado, for a short time, and then they moved to Rusk, Texas, when E.A. was four or five months old. When E.A. was seven months old, Stephanie left Joshua and moved to Oklahoma without telling him where she was going; Joshua explained that she left because "we were arguing and fighting," and he was arrested for domestic violence against Stephanie.

Four or five months later, Stephanie moved to Fort Worth with E.A. to live with her father, Tom Weaver. Later that month, in August 2005, the Department received a referral stating that E.A., who was eleven months old, had been left unattended on a balcony outside a third-floor room at the Best Budget Motel in Fort Worth. Stephanie testified that she was living at the motel for a week because she "needed a break" or "vacation" from her father, with whom she "really clash[ed] sometimes." She could not explain how E.A.,

4

who could crawl but not walk, had escaped from the room; Stephanie said that she was taking a nap at the time, but denied having used drugs. The Department was unable to find Stephanie or E.A. at the motel.

After the motel incident, Stephanie and E.A. moved back in with her father. Sometime after that, she moved in with Michael Seay, a former boyfriend and convicted felon.

In December 2005, the Department received another referral regarding E.A. This referral concerned reports of drug use and an allegation that Stephanie had been seen slapping E.A. in the face. Initially, the Department was unable to locate Stephanie or E.A., but they found Stephanie later that month, removed E.A. from her custody, and placed him in foster care.

In January 2006, the Department agreed to an order returning E.A. to Stephanie's custody. Under the terms of the order, the Department was appointed as E.A's temporary managing conservator, and Stephanie agreed that she and E.A. would live with Weaver and not move without notifying the Department. Later that month, Stephanie asked for permission to move out of her father's house; the Department refused permission. On February 1, 2006, when attempting to check on E.A.'s welfare, the Department learned that Stephanie and E.A. had moved out of Weaver's home two days earlier. The Department did not locate Stephanie, Joshua, or E.A. until April 1, 2006. Stephanie performed none of the services required by her service plan during

5

her two-month absence.  When the Department eventually found Stephanie and E.A., they were in a house that smelled strongly of marijuana.  E.A. was dirty, smelled of marijuana smoke, and had a bruise on his forehead.  Stephanie testified that she and E.A. were visiting a friend she called "Sexy Grandpa" (she did not know his real name) and that the smell of marijuana was coming from the back of the house where some "young teenage kids," whom she did not know, were "running around."  The Department again removed E.A. from Stephanie's custody and placed him in foster care.

Stephanie and Joshua married in July 2006.  They lived briefly with Michael Seay, then moved in with the Adamses—the paternal grandparents of another of Stephanie's children—for a few months.  They next moved into a duplex in Benbrook, where they lived for less than a month; then they moved back in with the Adamses.  Finally, in January 2007, Stephanie and Joshua moved into another house, where they were living at the time of trial.  Several witnesses testified that their home was "very clean" and "nice."  In February 2007, they allowed a registered sex offender, who is a friend of Joshua's, to live with them.  At the time of trial, the sex offender had moved out of their home, but was living four doors down in a nearby duplex.

Joshua has a history of assault and domestic violence.  In addition to the assaults against Stephanie described above, he was convicted of assault-bodily injury and assault-bodily injury to a family member in 1999 and 2000.

In 2003, another of Joshua's children, A.A., was removed from his custody. This occurred after Stephanie began living with him. After the removal, Joshua and Stephanie moved to Colorado, where E.A. was born; Joshua testified they moved so he could earn money to hire an attorney. His parental rights to A.A. were terminated in May 2004; the grounds for termination included those set out in family code section 161.001(1)(D) and (E). *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E). Before the Department removed A.A., she told Joshua that someone called "Cowboy" had attempted to sexually assault her; Joshua did not report the offense.

At the time of trial, Stephanie's fourth and fifth children were living in Florida with her mother, Bobbie Boyd. A trial court had appointed Boyd and her husband to serve as those children's permanent managing conservators in 2003. Boyd testified that she and her husband wanted to be appointed to serve as E.A.'s permanent managing conservators and that they were willing to adopt him. A Florida agency had completed a home study on the Boyds, but the Department had not yet received it at the time of trial.[2]

Rachael Woods, the Department caseworker who handled E.A.'s case from May until mid-August 2006, testified that she developed service plans for

---

[2] The Department later filed the Boyds' home study with the trial court, and it was filed with this court as a part of the clerk's record. The home study is overwhelmingly positive and recommends that E.A. be placed with the Boyds.

7

Stephanie and Joshua. Woods said Stephanie completed her parenting classes and psychological evaluation. She testified that Stephanie and Joshua interacted appropriately with E.A. and that E.A. was bonded to them.

Elizabeth Bowlen was E.A.'s caseworker after mid-August 2006. She testified that, in her opinion, although Stephanie and Joshua had completed parenting classes in August 2006, they had not demonstrated that they could parent E.A. and that terminating their parental rights was in E.A.'s best interest. She said that E.A. was very happy, was "doing great" in his foster home, and was very bonded to his foster parents and siblings. The foster family was interested in adopting him, but Bowlen said the Department's plan was adoption by his grandparents, Bobbie and Chris Boyd. She testified that E.A. was always happy to see Stephanie and Joshua and had fun playing with them, but he did not treat them like he treated his foster parents, and he seemed more bonded to his foster parents.

Betty Swift was E.A.'s child advocate. She testified that she had visited E.A. at his foster home and that he was bonded with his foster family. She also observed supervised visits between Stephanie, Joshua, and E.A.; E.A. was accepting of their affection, but he did not exhibit any distress when he had to leave at the end of the visits. Swift related one incident during a visitation when Joshua gave E.A. a toy gun that "evidently . . . shocked [E.A. or] vibrated" when he pulled the trigger; she said Stephanie and Joshua thought

8

it was funny. During another visitation, Joshua became irate after Swift told him he needed to attend anger-management classes—he "jumped up and raised his hands in the air and was yelling and walking back and forth"—and an aide had to remove E.A. from the room.

In her written recommendation made and filed on the first day of trial, Swift recommended as follows:

> This Advocate cannot recommend return of [E.A.] to his parents nor support termination, even though this child advocate recognizes that the grounds for termination exist. It is not in the best interests of [E.A.] to do so. Based on the fact that the optimal permanency plan is placement of [E.A.] with his maternal grandparents Chris and Bobbie Boyd and his other siblings, it appears to this advocate to be counterproductive to terminate parental rights on this child alone.

She testified that she was uncomfortable with the idea of the Boyds adopting E.A. because they had not adopted the other two of Stephanie's children who were in their care (and could not, because Stephanie's rights as to those children remained intact). When asked if this last factor pertained more to the best interests of the other two children, rather than E.A.'s, she replied, "Not necessarily, because you have to think of all three children. Even if E.A. were adopted and he had the [adoptive parents'] name, he's got to defend that to the other kids, so it's just as hard on him as the other two that were, quote, never adopted." Ultimately, Swift testified that she could not make a recommendation regarding termination one way or the other. She said that she

9

had told Stephanie and Joshua that "the drugs, if nothing else in the world, the drugs will keep them from their child."

Denise Randall, a permanency director with the Department, testified that termination of Stephanie's and Joshua's parental rights with regard to E.A., as opposed to appointing the Department as E.A.'s permanent managing conservator, was in E.A.'s best interest because it would open the door for the Boyds—or someone else—to adopt him. Randall said that appointing the Department to serve as E.A.'s permanent managing conservator was not in E.A.'s best interest because the Department had not yet received the Boyds' Florida home study, and if the study was negative and the Department could not place E.A. with the Boyds, he might be trapped in the foster care system for the next sixteen years.

Dan Greene, a licensed psychologist, testified that Stephanie and Joshua had attended his anger management class twice and described their participation as excellent.

JoAnn Adams and E.J. Adams are the grandparents and conservators of one of Stephanie's daughters. The Adamses are also the pastors of a church Stephanie and Joshua attend. JoAnn testified that Stephanie had made dramatic and rapid improvement lately, and that Joshua "is a completely different person." E.J. said that both Stephanie and Joshua had made "unbelievable" progress and described Joshua's behavior as "excellent." JoAnn

10

was unaware of any recent drug use. She said she would be reluctant to return Stephanie's daughter to her. Both JoAnn and E.J. had visited Stephanie and Joshua's current home and described it as "very clean" and "very neat." E.J. said that Joshua had a good job and that he and Stephanie had a large support group through their church.

Stephanie's eldest child, Sara, who was eighteen at the time of trial and the mother of two children of her own, testified that Stephanie was a good mother, and while she trusted Stephanie and Joshua with her own children, she would not at the time of trial allow her children to spend the night with them.

**Procedural History**

The Department filed its petition for termination on December 21, 2005. As grounds for termination, the Department alleged that Stephanie and Joshua knowingly placed or allowed E.A. to remain in conditions or surroundings, or engaged in conduct or knowingly placed E.A. with persons who engaged in conduct, which endangered E.A.'s physical or emotional well-being, and that they constructively abandoned E.A. while he was in the Department's conservatorship. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (N) (Vernon Supp. 2007) On November 21, 2006, the trial court signed an agreed order extending the dismissal date for the proceeding beyond the one-year statutory deadline. *See id.* § 263.401(b) (Vernon Supp. 2007).

11

On March 29, 2007—four days before trial—the Department filed an amended petition alleging for the first time as grounds for termination as to Joshua that a court had terminated his parent-child relationship with another child based on a finding that his conduct violated family code sections 161.001(1)(D) or (E). *See id.* § 161.001(M) (Vernon Supp. 2007). Both Stephanie and Joshua filed motions to strike the pleading as untimely or, alternatively, for continuance. The trial court denied both motions on the first day of trial.

After a bench trial, the trial court found by clear and convincing evidence that Stephanie and Joshua knowingly violated family code sections 161.001(1)(D) and (E); that Joshua had had his parent-child relationship terminated with respect to another child based on a finding that his conduct violated sections 161.001(1)(D) or (E); and that termination was in E.A's best interest. The trial court terminated Stephanie's and Joshua's rights to E.A. and appointed the Department as E.A.'s permanent managing conservator. Stephanie and Joshua filed timely statements of points on appeal and notices of appeal.

**Discussion**

In four issues, Stephanie challenges the factual sufficiency of the evidence to support the trial court's section 161.001(1) and best-interest

12

findings and argues that the trial court abused its discretion by allowing the Department to amend its petition on the eve of trial to allege a prior termination against Joshua. Joshua makes essentially the same arguments in three issues and challenges the legal sufficiency to support the trial court's findings under section 161.001(1).

1. **Did the trial court abuse its discretion by allowing the Department to amend its termination petition less than seven days before trial**?

Stephanie, in her fourth issue, and Joshua, in his first issue, argue that the trial court abused its discretion by failing to strike an amended petition filed by the Department four days before trial without leave of court. The amended petition alleged for the first time the prior termination of Joshua's parent-child relationship with A.A. as a ground for terminating his parent-child relationship with E.A. *See* TEX. FAM. CODE ANN. § 161.001(1)(M) (setting out termination of parent-child relationship with another child as ground for termination).

Rule 63 of the Texas Rules of Civil Procedure governs pleading amendments. TEX. R. CIV. P. 63. A party may amend its pleadings at any time unless the amendment will operate as a surprise; but any pleadings offered for filing within seven days of trial shall be filed only after leave of court is obtained. *Id*. We review the trial court's ruling allowing an amended pleading for an abuse of discretion. *Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex. 1980). A trial court abuses its discretion when its ruling is arbitrary,

13

unreasonable, or without reference to any guiding rules or legal principles. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

The trial court has no discretion to refuse an amendment unless the opposing party presents evidence of surprise or prejudice or the amendment is prejudicial on its face because, for example, it asserts a new cause of action or defense. *Greenhalgh v. Serv. Lloyd's Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990); *Hardin*, 597 S.W.2d at 349–50. But merely because an amended pleading asserts a new cause of action does not make it prejudicial to the opposing party as a matter of law. *Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743, 749 (Tex. App.—Dallas 1996, writ denied). An amendment is prejudicial on its face if (1) it asserts a new substantive matter that reshapes the nature of the trial itself, (2) the opposing party could not have anticipated the amendment in light of the prior development of the case, and (3) the opposing party's presentation of the case would be detrimentally affected. *Id.*; *see also Rusk v. Rusk*, 5 S.W.3d 299, 309 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). The burden of showing surprise or prejudice is on the party resisting the amendment. *Hardin*, 597 S.W.2d at 349. A mere allegation of surprise is not a sufficient showing. *La. & Ark. Ry. Co. v. Blakely*, 773 S.W.2d 595, 597 (Tex. App.—Texarkana 1989, writ denied).

The Department filed its original termination petition on December 21, 2005. The original petition identified another man, James C., as E.A.'s presumptive father and therefore did not allege grounds for termination against Joshua; but an affidavit attached to the petition averred that in addition to Stephanie's own children, "[t]here was also another child, [A.A.], [who] was removed" from her home. The Department filed its first amended original petition on June 13, 2006, this time identifying Joshua as E.A.'s father and seeking to terminate his parental rights. The Department attached the same affidavit to its amended petition. The Department filed its second amended original petition on March 29, 2007—four days before the April 2 start of trial—alleging for the first time the termination of Joshua's parental rights with regard to A.A. as grounds for terminating his rights with regard to E.A.

Both Stephanie and Joshua filed motions to strike the Department's second amended petition, alleging surprise to the newly-added ground for termination. At the hearing on the motions to strike, Stephanie's counsel testified that she was surprised by the late allegation and that both parents were substantially prejudiced because they had no opportunity to investigate the allegation. Joshua's counsel made a similar argument but did not testify. Stephanie testified that she was living with Joshua and A.A. when the Department removed A.A. and that she and Joshua moved to Colorado while

15

A.A. was in foster care. She first testified that they learned that Joshua's parental rights had been terminated when they returned from Colorado in 2004, but then she said that she did not realize that it was a "final" termination until a week or so before trial and that their plan "has always been to get [A.A.] back." She also volunteered that "[w]e're not allowed to talk to [A.A.]," which suggests that she knew that the Department had not simply removed A.A. from her and Joshua's home. The Department's attorney did not explain why she waited until the eve of trial to allege the prior termination, but she argued that Stephanie and Joshua could not show surprise because they both knew—at the very least—that the Department had removed A.A. from their home and never returned her to their care and the affidavits filed with the original and amended petitions put their counsel on notice of the removal as well. The trial court denied the motions to strike, stating on the record that the late-filed amendment did not act as a surprise because the parents and their attorneys had actual knowledge or notice of A.A.'s removal and that earlier knowledge of the termination would not make a difference in terms of preparation for trial because if the termination occurred as alleged, "the whole issue is the best interest issue that you have already prepared for."

Under the circumstances, we cannot say that the trial court abused its discretion by denying the motions to strike. Stephanie and Joshua alleged

surprise, but Stephanie also testified that she and Joshua learned of the termination in 2004. At the very least, they both knew that the Department had removed A.A. and had never returned her to their care and that they were prohibited from communicating with her. Even if Stephanie and Joshua failed to mention A.A. to their attorneys, the Department's affidavit put counsel on notice that A.A. had been removed from their home; thus, the parents and their counsel could have reasonably anticipated the Department's prior-termination allegation in light of earlier developments in the case. Finally, as the trial court observed, the late amendment did not detrimentally affect the parties' preparation for trial because if the earlier termination occurred as alleged, Joshua's only defense to the termination of his rights with regard to E.A. was the issue of E.A.'s best interest—an issue for which the parties were presumably prepared. Therefore, we hold that the trial court did not abuse its discretion by denying Stephanie's and Joshua's motions to strike. We overrule Stephanie's fourth issue and Joshua's first issue.

## 2. Grounds for termination

In her second and third issues, Stephanie challenges the factual sufficiency of the evidence to support the trial court's endangering-surroundings and endangering-conduct findings. In his second issue, Joshua challenges the

17

legal and factual sufficiency of the evidence to support the trial court's endangering-surroundings, endangering-conduct, and prior-termination findings.

### a. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26. In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20-21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

18

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish at least one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied).  It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

### b. Grounds for termination: Stephanie

The trial court found that Stephanie (1) knowingly placed or knowingly allowed E.A. to remain in conditions or surroundings which endangered his physical and emotional well-being and (2) engaged in conduct or knowingly placed E.A. with persons who engaged in conduct which endangered E.A.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

Under section 161.001(1)(D), the environment of a child must be examined to determine if that is a source of endangerment to the child. *Id.* § 161.001(1)(D); *In re D.T.,* 34 S.W.3d 625, 632 (Tex App.—Fort Worth 2000, pet. denied). Under section 161.001(1)(E), the term "endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533. Accordingly, when analyzing the trial court's findings under subsection (E), we must determine whether sufficient evidence exists that the endangerment of

20

the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.M.*, 58 S.W.3d 801, 811–12 (Tex. App.—Fort Worth 2001, no pet.). Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM. CODE ANN. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id*.

To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *D.M.*, 58 S.W.3d at 812. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

A pattern of continued drug use, including drug use during the pregnancy of another child and a parent's failure to remain drug-free while under the Department's supervision, will support a finding of endangering conduct under section 161.001(1)(D) even if there is no direct evidence that the parent's drug

21

use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding evidence legally and factually sufficient to support endangering-conduct finding when older sibling of subject child tested positive for drugs at birth and parent continued to use drugs after subject child's birth and during pendency of Department's involvement). A fact-finder may reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children. *In re T.N.,* 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet).

The record shows that Stephanie used illegal drugs before E.A. was born, continued to use them after he was born, and even continued to use drugs during the pendency of the termination case. Stephanie testified that she began using methamphetamine at age twenty and marijuana at age twenty-three. Three of her children tested positive for illegal drugs at birth, one for amphetamine, one for marijuana, and one for both methamphetamine and

22

marijuana. Stephanie testified that she used methamphetamine and marijuana when pregnant with her fifth child. She denied having used drugs while pregnant with E.A. but admitted that she used drugs after he was born. In her psychological evaluation, Stephanie told the psychologist that she last used marijuana in November 2005, which was after E.A. was born and before the Department removed him from her care. In April 2006, the Department found Stephanie and E.A. in a house that smelled strongly of marijuana smoke. After E.A.'s removal, Stephanie submitted to only six of twelve requested drug tests. One of the hair-follicle tests to which she did submit was positive for methamphetamine, and another urinalysis was "off-temp." Stephanie signed a service plan in June 2006 in which she agreed to "demonstrate an ability to stay away from a drug/alcohol lifestyle"; by her own admission, she used methamphetamine after so agreeing. Stephanie's mother testified that Stephanie told her she had smoked marijuana on February 14, 2007, about six weeks before trial.

On the other hand, there is no direct evidence that Stephanie abused drugs while she was actually caring for E.A. The record also shows that Stephanie completed a drug-counseling class shortly before trial, albeit not a class approved by the Department. JoAnn Adams and E.J. Adams testified that she had made dramatic progress shortly before trial. A hair follicle test

23

conducted about a week before trial indicated that Stephanie had not used drugs for the prior ninety days.

In addition to the evidence concerning Stephanie's drug use, the record shows that she changed residences frequently, lived with a convicted felon while E.A. was in her care, and allowed E.A. to crawl onto the third-floor balcony of a motel while she slept. She also changed residences without the Department's permission and without telling them where she and E.A. were, and when the Department located her two months later, she and E.A. were in a house that smelled strongly of marijuana.

Considering all of the evidence, including the evidence which contradicts the trial court's findings, we hold that a reasonable fact-finder could have formed the conviction that Stephanie endangered E.A.; thus, the evidence is factually sufficient to support the trial court's findings under section 161.001(1)(D) and (E). We overrule Stephanie's second and third issues.

### c. Grounds for termination: Joshua

The prior termination of a parent-child relationship based on a finding that the parent violated paragraph (D) or (E) of section 161.001(1) is grounds for the subsequent termination of a parent's relationship with another child. TEX. FAM. CODE ANN. § 161.001(1)(M). The trial court admitted into evidence the order terminating the parent-child relationship between Joshua and A.A. in 2004,

24

and the order states that the trial court found that Joshua violated both paragraphs (D) and (E) with regard to A.A. Therefore, the evidence is both legally and factually sufficient to support the trial court's finding in the instant case as to paragraph (M). *See In re J.M.M.*, 80 S.W.3d 232, 243 (Tex. App.—Fort Worth 2002, pet. denied) (holding prior termination order that contains paragraph (D) or (E) findings is legally and factually sufficient to establish grounds for subsequent termination under paragraph (M)), *disapproved on other grounds, In re J.F.C.*, 96 S.W.3d 256, 267 (Tex. 2003); *see also In re S.A.P.,* 169 S.W.3d 685, 706 (Tex. App.—Waco 2005, no pet.) (holding evidence legally and factually sufficient under paragraph (M) when parent did not challenge fact of prior termination).

Joshua argues that literal application of paragraph (M) will lead to absurd results that the legislature did not intend, citing the hypothetical example of a parent whose relationship with one child is terminated, who thereafter reforms, and whose relationship with another child is later terminated under paragraph (M) even if the person has become a "wonderful parent." But section 161.001 guards against this hypothetical result by requiring a finding that termination is in the child's best interest, and the best interest analysis—which we conduct in the following section of this opinion—takes into consideration the concerns Joshua raises in his brief. *See* TEX. FAM. CODE ANN. § 161.001.

25

We hold that the evidence is legally and factually sufficient to support the trial court's finding under paragraph (M). Because a finding of a violation of a single paragraph of section 161.001(1) — coupled with a finding that termination is in the child's best interest — will support a termination order, we need not consider Joshua's argument that the evidence is legally and factually insufficient to support the trial court's findings under paragraphs (D) and (E). *See id.;* TEX. R. APP. P. 47.1. We overrule his second issue.

### d. E.A.'s best interest

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)    the desires of the child;

(2)    the emotional and physical needs of the child now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individuals seeking custody;

(5)    the programs available to assist these individuals to promote the best interest of the child;

26

(6)    the plans for the child by these individuals or by the agency seeking custody;

(7)    the stability of the home or proposed placement;

(8)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

We will consider the evidence under each of the *Holley* factors to determine if it would produce in the mind of the trier of fact a firm belief or conviction that termination is in E.A.'s best interest. *See* TEX. FAM. CODE ANN. § 101.007.

**(1)    E.A.'s desires.**

E.A., who was only two years old at the time of trial, did not testify or verbally express his desires. The Department argues that testimony that E.A.

27

accepted his parents' hugs but did not initiate them and that he was bonded to his foster family supports a finding that E.A.'s desires weighed in favor of termination. But Rachael Woods testified that E.A. was bonded to Stephanie and Joshua, too, and the Department did not plan to place E.A. with his foster family. While the evidence cited by the Department may be some evidence of E.A.'s desires, it is not clear and convincing evidence.

**(2) E.A.'s emotional and physical needs now and in the future**.

As the Department acknowledges, there was no evidence that E.A. has any special physical needs, and the child advocate reported that he appeared to be happy, healthy, and developmentally on target. The child advocate also expressed concern that E.A. would be emotionally harmed if the trial court ordered termination and thereby opened the door for E.A.'s adoption by Bobbie and Chris Boyd, who had custody of but could not adopt E.A.'s two half siblings. The Department points to Stephanie's and Joshua's domestic instability as evidence supporting termination, and that instability is well established by the record.

**(3) The emotional and physical danger to E.A. now and in the future**.

Some evidence presented at trial supports the conclusion that immediate reunification between E.A., Stephanie, and Joshua might put E.A. in emotional and physical danger now and in the future. Foremost among such evidence is

Stephanie's and Joshua's long-time drug use and, in Stephanie's case, the admitted use of illegal drugs during the pendency of this proceeding, or in Joshua's case, the apparent use of drugs suggested by his missed and failed drug tests. This evidence weighs heavily in favor of termination. On the other hand, other evidence suggests that both parents made rapid if late progress in putting their drug use behind them. Similarly, with regard to Stephanie and Joshua's history of domestic violence, both were taking anger management classes, albeit belatedly.

**(4)    The parental abilities of the persons seeking custody.**

Neither Stephanie nor Joshua has exhibited exemplary or even passable parenting abilities in the past. Stephanie has five other children but has raised none of them. Joshua's relationship with his daughter was terminated. The history of domestic violence, drug use, domestic instability, and—in Stephanie's case—unemployment supports a finding that reunification would not be in E.A.'s best interest, at least at the present time. By contrast, the Boyds, with whom the Department intends to place E.A., have been raising two of Stephanie's other children for several years.

**(5)    Programs available to assist those seeking custody**.

Our review of the record finds no significant evidence related to this factor.

29

**(6)     The plans for E.A. of those seeking custody and**
**(7)     the stability of the home or proposed placement**.

Bobbie Boyd testified that she and her husband wanted E.A. to be placed with them and that they were "willing to consider" adoption.  Denise Randall testified that termination of Stephanie's and Joshua's parental rights was in E.A.'s best interest because the Department had not yet received the Boyds' home study, and if the home study turned out to be negative and the Department could not place E.A. with the Boyds, termination would allow someone else to adopt E.A, thus keeping him out of foster care for the next sixteen years.

Betty Swift, E.A.'s child advocate, recommended placing E.A. with the Boyds permanently and explained, "I feel like the child has a good future there. I think that he has the siblings there.  They've exhibited very good parenting skills as far as what we've seen with [the other children] here.  I think he needs to be with his siblings."  But Swift stopped short of recommending termination, testifying, "I'm still struggling with it. . . . I wish I could tell you this is exactly what I would recommend.  I'm sorry.  I can't do this."

**(8)     Acts or omissions of the parents which may indicate that the existing parent-child relationship is not a proper one**.

We have already detailed the evidence that may indicate that the existing parent-child relationship between Stephanie, Joshua, and E.A. is not a proper

30

one, including the parents' drug use, domestic instability, and domestic violence. More than any other evidence, this evidence weighs heavily in favor of a finding that termination is in E.A.'s best interest. On the other side of scale is the testimony, which makes this a difficult case, that Stephanie and Joshua have made significant, if belated, changes and improvements in their lives.

**(9)     Any excuse for the acts or omissions of the parents.**

The record does not reflect any excuses for Stephanie's and Joshua's acts and omissions.

Considering all of the evidence relevant to the *Holley* factors, including the evidence that contradicts the trial court's best-interest findings, we hold that a fact-finder could rationally have formed a firm belief or conviction that termination of Stephanie's and Joshua's parental rights as to E.A. is in E.A.'s best interest; therefore, the evidence is factually sufficient to support the trial court's best-interest findings. We therefore overrule Stephanie's first issue and Joshua's fourth issue.

## Conclusion

Having overruled all of Stephanie's and Joshua's issues, we affirm the trial court's termination order.

ANNE GARDNER
JUSTICE

PANEL F:    GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: April 24, 2008